IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN - 2 2008

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| ALBERT CLINTON RICHARDS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | NO. 4:07-CV-118-A |
| | § | |
| NATHANIEL QUARTERMAN, DIRECTOR, | § | |
| TEXAS DEPARTMENT CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISION, | § | |
| | § | |
| Respondent. | § | |

MEMORANDUM OPINION
and
ORDER

I.

Procedural Background

This action was instituted on February 20, 2007, by the
filing by petitioner, Albert Clinton Richards, of a petition for
writ of habeas corpus by a person in state custody, pursuant to
the authority of 28 U.S.C. § 2254.

Petitioner has been in custody since February 2003, when he
was charged by indictment filed in the 213th District Court of
Tarrant County, Texas, with the murder of Cullen Baker ("Baker").
A state court jury returned a verdict on October 3, 2003, finding

petitioner guilty of murder as charged in the indictment.[1]
Pursuant to petitioner's waiver of a jury at the punishment phase
of his trial, the state district judge sentenced petitioner to a
term of imprisonment of twenty-five years in the Institutional
Division of the Texas Department of Criminal Justice.

Petitioner unsuccessfully appealed from his conviction to
the Court of Appeals, Second District of Texas, Fort Worth. His
request for discretionary review by the Court of Criminal Appeals
of Texas was denied. He unsuccessfully sought grant of a writ of
habeas corpus by the Court of Criminal Appeals of Texas.

By order signed March 2, 2007, in the instant action, United
States Magistrate Judge Charles Bleil ordered respondent,
Nathaniel Quarterman, Director, Texas Department of Criminal

---

[1]The relevant parts of the indictment are as follows:

Paragraph Two: And it is further presented in and to said
court that the said defendant in the county of Tarrant and
state aforesaid on or about the 16th day of February, 2003,
did then and there intentionally, with the intent to cause
serious bodily injury to Cullen Baker, commit an act clearly
dangerous to human life, namely hitting him with a deadly
weapon, to-wit: a rock, that in the manner of its use or
intended use was capable of causing death or serious bodily
injury, which caused the death of cullen baker.

State Clerk's R. 2. Paragraph Two of Count Two is identical except
that the word "brick" replaces the word "rock," id.; Paragraph Two of
Count Three is identical, except that the words "an object unknown to
the grand jury" replaces the words "a rock," id. at 2A; and, Paragraph
Two of Count Four is identical except that the words "piece of
concrete asphalt" replace the word "rock," id.

2

Justice, Correctional Institutions Division, to respond to the

§ 2254 petition within thirty days of the date of the order. On

April 2, 2007, Judge Bleil signed an order granting respondent an

extension until May 1, 2007, to respond. A second extension

sought by respondent was granted by order signed by Judge Bleil

on May 10, 2007, this one giving respondent until May 31, 2007,

to respond. On May 31, 2007, respondent filed his response to

the petition. Petitioner replied to the response by a document

filed June 21, 2007. Magistrate Judge Bleil issued his findings,

conclusions, and recommendation on April 24, 2008, recommending

that the petition be denied. Judge Bleil concluded that a proper

characterization of the grounds of the petition were as follows:

- (1) There was no evidence proving the corpus delicti of the offense or that the weapon used was a deadly weapon (grounds one and five);

- (2) His conviction was obtained by the state's use of extraneous offenses (ground two);

- (3) He was entitled to a charge on the lesser included offense of aggravated assault (ground three);

- (4) The prosecution withheld favorable evidence from the defense (ground four); and

- (5) He received ineffective assistance of trial counsel (ground six). (Petition at 7-8)

FC&R at 4. Petitioner filed his objections to Judge Bleil's

findings, conclusions, and recommendation on May 7, 2008.

3

After a complete review of the record of this action, including the record of the state court proceedings, the court has concluded that Judge Bleil's recommendation for denial is meritorious, and should be accepted, as to grounds (1), (2), (3), and (4) of the petition. The court so rules.

However, the court has serious concerns about the quality of the legal representation petitioner had in his state court trial. Those concerns led to an order the court signed May 15, 2008, directing respondent to provide copies of witness statements, reports of witness statements, and related material.[2] Respondent complied with the order by providing 346 pages of documents that included statements of most of the trial witnesses called by the prosecution. A review of those statements has heightened the court's concern. Therefore, the court is conducting further proceedings relative to petitioner's ground that he received ineffective assistance of trial counsel.

A purpose of this memorandum opinion is to inform the parties of areas of concern to which they should direct their attention in future proceedings in this action.

---

[2]A factor that prompted the court to issue the May 15, 2008, order was the contention made by petitioner in his papers that trial testimony given by witnesses was inconsistent with pretrial statements given by the witnesses.

Areas of Concern Relative to Petitioner's
Trial Representation

A.   Trial Counsel's Failure to Apprise the Jury of Dead
     Man's Own Descriptions of Events Preceding His Death
     that Significantly Varied from the Pre-Death Sequence
     of Events Developed by the Prosecutor at Trial.

     1.   The Versions of Events Developed at Trial.

     The evidence developed by the prosecutor at trial in support

of the contention that petitioner murdered Baker was,

essentially, as follows:

     Petitioner and Baker had an altercation around 3:00 a.m. the

morning of February 14, 2003, that caused Baker to suffer brain

injuries that led to his death several hours later by reason of a

brain hemorrhage.  The State presented two persons as eye

witnesses to the altercation, Arthur Brown, Jr. ("Brown"), and

Leo Qualls ("Qualls").  The two of them had been with petitioner

and Baker (all of whom were homeless-type persons) during part of

the day of February 13, 2003, and, according to the prosecutor's

theory, into the early morning hours of February 14.  While they

were together they used cocaine, drank wine, and panhandled at

various times.  Most of the activities about which the witnesses

testified occurred near the intersection of Interstate 35 and

Rosedale Street in Fort Worth, Texas, where a tent erected on a

concrete slab for church services to be performed for homeless
people (the "slab church") and a tent in which Baker lived were
located. Brown had an automobile that was used for
transportation from time to time during their activities. A
summary of the trial testimony on the subject of cause of death
and concerning related events follows below.

a. Brown's Testimony.

Brown testified about disagreements petitioner and Baker had
between themselves during the evening of February 13, the
activities of Qualls, Baker, petitioner, and Brown throughout
that evening, and an assault by petitioner on Baker the early
morning of February 14 that the prosecutor maintained caused
Baker's death.

Shortly before the occurrence of the altercation that the
prosecutor contended caused Baker's death, Brown, Qualls, and
petitioner left the area of Baker's tent in Brown's car after
petitioner and Baker had had a minor altercation that led to
petitioner hitting Baker with a boot several times. When
petitioner entered the car, he had with him a stick about three
or four feet long. As they were leaving, petitioner made a
remark that Brown found offensive, and Brown made petitioner exit

the car. When he exited, he still had the stick, and Brown saw petitioner walking towards Baker's location.

According to Brown's testimony, the altercation the prosecutor contended caused Baker's death occurred just as Baker and Qualls returned to the slab church in Brown's car after they had been "out there to Las Vegas Trail to do a little more panhandling." Trial Tr. at 86. When they arrived, petitioner appeared to be asleep on the slab at the slab church as Baker was walking around petitioner holding in one hand the stick that petitioner had when they put him out of the car before they left to go panhandling and a piece of rebar (a length of steel) in the other, bragging that he had whipped petitioner and put him to sleep. Before Brown got out of the car, petitioner got up, tied his shoes, reached where he was sleeping and pulled out a piece of asphalt, and went to Baker and started hitting him with the asphalt. Petitioner knocked Baker down, and kept hitting him on the head, striking him on the head and face nine or ten times. When petitioner hit Baker, Baker dropped his weapons, the stick and piece of rebar.

According to Brown, the only persons present at the time of the assault were petitioner, Baker, Qualls, and Brown. Brown testified that he exited his car and pulled petitioner off Baker.

During the altercation Qualls was sitting in Baker's car. After
Brown separated petitioner and Baker, he and Qualls drove off.
According to Brown, the altercation occurred at about 2:30 or
3:00 a.m. on February 14.

b.   Qualls's Testimony.

For the most part, the testimony of Qualls was somewhat
consistent with Brown's testimony. He said that when he and
Brown returned from panhandling to the slab church he saw Baker
holding the rebar and stick, and heard Baker say that he had hit
petitioner in the leg and in the back of the head, that he broke
petitioner's leg, and that petitioner would be out for awhile.
He also heard Baker say that he was going to bust petitioner's
head by hitting him in the back of the head. That is when
petitioner got up and started hitting Baker. According to
Qualls, when Brown and Qualls drove off after the altercation
they left petitioner and Baker talking to each other.

Brown and Qualls both testified that Brown was known by the
homeless people as Baker's bodyguard. Baker had trouble with
several people in the past, and had been getting in trouble.

8

c.    Thomas's Testimony.

Witness Joy Thomas ("Thomas"), who lived in a house located near the place where Baker's tent and the slab church were located, testified that Baker came to the Thomas home at 3:00 a.m. on February 14, 2003, and awakened them by shaking the iron gates on their front porch and banging on the window and wall of their house, calling for her husband. She had seen Baker on prior occasions, and her husband apparently had visited with him from time to time. When they recognized that the person who awakened them was Baker, her husband went out to talk to him while she called for emergency help. The police and the ambulance came. Baker refused to leave in the ambulance, but the ambulance attendants cleaned and treated a big gash he had on the back of his head. Baker told the ambulance people he was okay, that he could see fine, and was not seeing double. He was complaining of pain, however. According to Thomas, Baker stayed at her home about three hours, until about 6:00 a.m. Thomas was prevented by reason of a sustained hearsay objection made by petitioner's trial counsel, Jill Davis, ("Davis") from answering the prosecutor's question asking Thomas what Baker said while he was at Thomas's house that morning. On cross-examination of Thomas, Davis established that three or four days before the

9

incident about which she testified several men tried to attack Baker, and chased him to beat him up, and on that occasion Baker was scared.

### d.  Oakley's Testimony.

Police Officer J. R. Oakley ("Oakley") testified that he answered the emergency call Thomas placed the morning of February 14.  The ambulance was there when he arrived at about 4:00 a.m. He took an assault report from Baker.  Baker appeared upset and mad when he took the information from Baker.  The judge sustained Davis's objection to the prosecutor's questions of Oakley asking what Baker said about the time of day when the altercation occurred and whether Baker was able to provide the names of the people who had assaulted him.  Oakley was permitted to testify that Baker gave him names, but he was not permitted to relate those names.  He testified that once he took the report of the incident from Baker, he immediately went out looking for four people as suspects at the location of the slab church.

### e.  Fornier's Testimony (and additional testimony of Brown and Qualls).

Three witnesses gave testimony concerning their observations of, and interactions with, Baker the morning of February 14 after he had returned to the slab church area.

10

Witness Michael Fornier ("Fornier"), a homeless person, was in the area of the slab church at around 6:00 a.m. to 7:00 a.m. on February 14. He saw Baker, and observed that Baker's face was messed up pretty badly and that he looked like he had been in a nasty fight. Fornier saw what appeared to be a two- to two-and-a-half-inch gash on the top of Baker's head. Baker was not complaining of any discomfort, but he appeared to be very agitated and angry, running and pacing back and forth like a caged tiger. He had a four-and-a-half-foot piece of rebar, which he kept bouncing on the concrete. Davis made a hearsay objection as Fornier was starting to relate what Baker told him of the events that led to Baker's injuries. The objection was sustained, with the consequence that Fornier was unable to relate to the jury what Baker told him. Fornier said that while he was visiting with Baker the morning of February 14, Brown and Qualls drove up in Brown's car. Fornier left the area around 10:45 to 11:00 a.m. He did not see Baker alive again.

Brown and Qualls both testified that they visited with Baker at the location of Baker's tent and the slab church the morning of February 14. They said that when they arrived they saw Baker visiting with Fornier. Baker was upset because Brown had left him the night before. Baker had lost his watch, and the three of

11

them searched for the watch. Baker saw petitioner's boots in the trunk of Brown's car, and told Brown he wanted to take the boots and sell them to try to make some money for the damage petitioner had done to his head. Brown took petitioner to try to sell the boots, but they were not successful, and when they came back Baker put the boots in his tent. Brown and Qualls last saw Baker alive when they left his tent at around 11:00 a.m. on February 14. Qualls said that before they left Baker that morning, he told Baker that he needed to go to the hospital, to which Baker responded that he was alright, adding that he was tough because he was a marine.

### f. Roger Richards's Testimony.

The prosecutor called as a witness Roger Richards ("Roger"), petitioner's brother. When petitioner was not living on the street, he stayed at Roger's home. The morning of February 15, 2003, Roger was trying to locate his brother. He went to the slab church because he knew his brother hung around there. When he went by Baker's tent he noticed Baker laying on his back in the tent. He yelled something to Baker, but Baker did not respond. The following morning, February 16, Roger went back to the slab church looking for petitioner. He noticed that Baker was still on the ground in his tent, in the same position he was

in the preceding morning. He checked to see if Baker had a

pulse, and, when he realized he did not, he called 911. About

two days after he found Baker's body, he located petitioner.

When he found petitioner, he noticed that petitioner was "all

swolled up," Trail Tr. at 87, and petitioner complained that his

shoulder was hurting. Petitioner told him that Baker had hit

petitioner on the shoulder with a stick, and that when he was

trying to get Baker off of him he hit Baker with a rock.

g.  Sisler's Testimony.

Deputy Medical Examiner Gary L. Sisler ("Sisler"), who

performed the autopsy on Baker on February 17, 2003, testified

concerning his observations during the autopsy and his opinion as

to cause of death. He found superficial abrasions over Baker's

left cheek, forehead, and right side of Baker's face. He also

noted an abrasion toward the crown area of Baker's head, on the

right side. Nothing about those abrasions and injuries led him

to believe that they had anything to do with Baker's death. When

he opened Baker's skull, he found a large blood clot on the

surface of the left side of the brain. He concluded that the

cause of Baker's death was a blunt-force injury to his head that

set in motion slow bleeding in the brain area. He made a rough

estimate that the clot was probably at least thirty-six hours

13

old. He said that sometimes closed-head injuries do not lead to symptoms initially.

        h.    <u>Petitioner's Testimony</u>.

The only witness who testified for the defense was petitioner. He testified that he went to the slab church where Baker's tent was located Wednesday night. That night Baker slept in his tent, petitioner slept on the side of Baker's tent, and Qualls and Brown slept in Brown's car. Petitioner described the activities of Baker, Brown, Qualls, and petitioner on Thursday. He confirmed to some extent the testimony given by Brown relative to disagreements that occurred between petitioner and Baker on February 13. After he and Baker almost had an altercation, petitioner, Brown, and Qualls left the area of Baker's tent in Brown's car. Petitioner took with him a stick that he had been using to defend himself against Baker. After they had driven a short distance, Brown made petitioner get out of the car. When petitioner exited, he still had the stick. He went back to the slab church and sat down and tried to catch his breath. He laid down on his side so he could watch Baker, and he put his stick down beside him. Baker had a piece of rebar.

Petitioner dozed off, and then Baker awakened him by kicking him in the rear. He reached for his stick, but it was gone.

14

Baker hit him in the head, and referred to him as a stupid bastard. He then tried to grab Baker, and Baker hit him in the ribs with a stick; and, when petitioner fell down, Baker hit him across his legs and jumped on top of him and started choking him. Petitioner was out of breath, and passed out. When he came to, he was on the concrete slab, and Baker was standing near him, holding a tree limb.

About that time Brown and Qualls drove up. When he saw Baker with a stick, he pretended to be asleep, thinking that Baker would hit him if he knew he was awake. He heard Baker tell Brown and Qualls that "I had hit him and choked him down." Trial Tr. at 187. Petitioner hoped that they would walk away so he could break and run, but he played like he was asleep because he was afraid he would pass out again. When he made a movement that Baker apparently observed, he heard Baker say, "Oh, this ain't over yet." Id. at 188. There were rocks around petitioner's feet that Baker had thrown at him while petitioner was asleep, so he hit Baker two or three times with one of those rocks while trying to get Baker's stick away from him. When he was hitting Baker, the stick went one way and he heard a piece of rebar that Baker apparently was holding fall.

15

He heard a car door slam, and heard someone say, "Don't hit him no more, don't hit him no more." Id. at 188-89. The fight lasted about forty-five seconds. The fight ended with petitioner and Brown having words, following which Brown left in his car with Qualls. The witness left, walking east on Rosedale Street. Baker followed him a short distance, but then disappeared. Petitioner never saw Baker again.

\* \* \* \* \* \*

For all practical purposes, counsel for petitioner did not challenge the prosecutor's version of events except to the extent it was challenged by petitioner's testimony as set forth above and by limited testimony that Ron Watkins ("Ron") might have been in an altercation with Baker the morning of February 14.[3] Other than the references to Ron, no evidence was presented to the jury concerning Baker's own version of the events preceding his death,

_____

[3]At pages 35-37 of the trial transcript there is testimony developed by defense counsel Davis from detective S. J. Waters to the effect that a person who matched one of the descriptions she had been given of a suspect was Ronald Watkins, and, while the testimony is somewhat garbled, part of it could be interpreted to convey that witness Fornier was told by Baker when Fornier was visiting with Baker the morning of February 14 that, in reference to Ron Watkins, "[t]here is one of the guys." Trial Tr. at 37. In this same line of questioning, Davis obtained, by developing hearsay testimony from the detective, that Watkins had denied "that he had anything to do with it." Id. Davis also was successful in obtaining a "[y]eah" answer from witness Brown to the question asking if Baker "told people Ronald Watkins had done it, too." Trial Tr. at 127.

16

as he related it to at least three people. Baker's version of
events differed drastically from the prosecution's version.

2. The Version of Events Given by the Dead Man that the
Jury did not Hear.

Had witness Oakley been permitted to relate to the jury what
Baker told him when Oakley responded to Thomas's call for
emergency assistance early in the morning of February 14, 2003,
the jury would have heard the following:

ON 021403 AT 0353 HRS OFFICER JR OAKLEY 3175 WAS
DISPATCHED TO 924 S FRWY IN REF TO A ASSAULT CALL. UPON
ARRIVAL AT 0358 HRS THIS OFFICER LOCATED THE COMP
INSIDE THE RESADINCE AT THIS LOCATION WHERE HE RELATED
THE FALLOWING. COMP RELATED THAT HE STAYS  IN A TENT
BEHIND THE AUTO SHOP AT 625 E ROSEDALE. COMP ADVISED
THAT ON THIS DATE AT APP 0330 HRS HE WAS ASLEEP IN A
CHAIR BESIDE HIS TENT WHERE HE WAS AWAKEN BY THE SUSP 1
AND 2. COMP ADVISED THAT AS HE AWOKE THE SUSP 1 BEGAN
TO STRICK HIM IN THE HEAD WITH THE SUSP WEAPON
( BRICK ). COMP THEN STATED THAT HE THEN HEARD THE SUSP
2 TELL THE SUSP 1 TO GET OUT OF THE WAY SO HE COULD HIT
HIM. COMP STATED THAT THE SUSP 2 THEN BEGAN TO ALSO
STRICK HIM IN THE HEAD WITH THE SUSP WEAPON ( STICK ).
COMP STATED THAT HE ALSO OBSERVED TWO OTHER B/M'S ALSO
HITTING HIM BUT COULD NOT GIVE A DESCRIPTION. COMP THEN
STATED THAT THE SUSP 1 AND 2 ALONG WITH THE OTHER 2
B/M'S THEN BEGAN TO WALK AWAY FROM HIM EAST BOUND UNDER
THE SOUTH FRWY BRIDGE . COMP ADVISED THAT HE KNOWS THE
SUSP 1 AND 2 AND ALSO STATED THAT THEY ASSAULTED HIM
BECAUSE HE TOLD THE POLICE ABOUT THEIR FRIEND<JIMMY
DEWBERRY>WHO BROKE INTO THE CHURCH BEHIND THIS
LOCATION. THIS OFFICER OBSERVED THIS COMP INJURIES TO
BE SWELLING AND A CUT ON HIS FORHEAD, A SMALL CUT ON
THE BACK OF THE HEAD , A BLK LEFT EYE, AND A SMALL CUT
ON THE TOP OF HIS HEAD. MEDSTAR 43 MADE THE SCENE AND
THE COMP REFUSED MEDICAL TREATMENT AT THIS TIME. THIS

17

OFFICER THEN SEARCHED THE AREA AND WAS UNABLE TO LOCATE
THE SUSP 1 AND 2. CSSU WAS NOT NOTIFIED.

Resp't's Advisory to the Court at 68-69 (errors and full caps in

original). Another document containing information about what

Baker told Oakley the early morning of February 14 is contained

in the arrest warrant affidavit made February 19, 2003, by police

detective S. J. Waters ("Waters")⁴ as follows:

> That on February 14, 2003 at approximately 0352 hours,
> the Fort Worth Police were called to 924 S. Freeway by
> the resident at that location to report that Baker had
> been assaulted. Officer J. R. Oakley ID # 3175 arrived
> and took an assault report from Baker, who told the
> officer that he had been attacked by four black males,
> two of which had struck him in the head with bricks and
> sticks. Officer Oakley observed the injuries to Baker,
> which included swelling and a cut to his forehead, a
> small cut on the top of his head and a black left eye.
> Medstar paramedics made the scene but Baker refused
> medical treatment.

Id. at 15. Apparently the person Oakley referred to in his

February 14 report as "SUSP 1" was identified by Baker as

"Albert" and the person referred to in the report as "SUSP 2" was

identified by Baker as "Ron." Id. at 65-66.

Had the jury been permitted to hear the version of events

Baker related to witness Thomas the morning of February 14, they

would have been informed that when Thomas called 911 at

---

⁴Waters was called by the prosecutor as a trial witness.

18

approximately 3:50 a.m. on February 14 she told the 911 operator
that Baker told her that "they caught him sleeping down there in
his tent where he has been staying at for awhile and some guys
caught him sleeping and he came up here for us to call the police
for him," id. at 167, that "he was hit in the head with a brick
and held down," id. at 168, that "three people jumped on him,"
and "[t]hey caught him asleep," id. at 170. And, if the jury had
received the benefit of Thomas's testimony as to what Baker told
her about the events of the morning of February 14, they also
would have learned that:

> On the night that [Baker] was attacked, [Thomas] heard
> someone in the front yard at around **3AM**. That person
> then came to the window on the side of the house &
> knocked on the window. [Thomas] opened the door &
> [Baker] asked [Thomas] to call 911. [Thomas] said that
> [Baker] was bleeding badly (gash on back of head was
> size of a silver dollar), and was able to coherently
> speak. Paramedics came & [Thomas] tried to get [Baker}
> to go to the hospital, but he refused medical
> attention.
>
> [Baker] stayed at [Thomas's] home for **2-3 hours**,
> eventually going back to his tent "to protect it."
> During this time, [Baker] told [Thomas] about what
> happened & a possible motive for the attack. [Baker]
> told [Thomas] that 3, 4 or 5 guys jumped him. More
> specifically, [Baker] & a friend, **Ron**, were eating
> sausages near [Baker's] tent. [Baker] fell asleep
> after eating & the next thing [Baker] remembered was
> being hit on the head with a brick. [Baker] told
> [Thomas] that **Ron had the brick**. ([Thomas] describes
> Ron as being a "tall, black guy--over 6 feet tall--who
> lives in a vacant house on Rosedale.") She and Mr. T

19

say they would be able to ID him if they saw a picture
of him.) [Baker] said that his $100 watch was missing.

[Baker] said that Ron probably got the other attackers
when [Baker] fell asleep. The "others" were men
involved in an **incident that occurred one to two days
prior to the attack**. The "incident involved [Baker]
picking up trash in the lot where he pitches his tent--
in exchange for getting to stay there, [Baker] picked
up trash. When [Baker] picked up a can, a woman got
man, saying it was her can, & hit him. [Baker] hit her
back. The woman, her boyfriend, and give or six other
black men chased [Baker] up the access road. [Thomas]
recalls seeing the mob chasing [Baker]. [Baker] told
[Thomas] that he **feared for his life**.

Id. at 345-346 (errors and bold face in original).[5]

If the jury had heard at trial what Baker had told witness

Fornier the morning of February 14, they presumably would have

heard the things Fornier said in the written statement he gave to

the investigators on February 19, 2003, that:

We started talking, [Baker] informed me he was just
beat up about 3 hours before we started talking.
[Baker] said that four black males had entered his tent
and beat him up. I looked over and saw his tent was
very close to us. He did not name anybody. He did say
that his bodyguard had talked to one of the men and
then proceeded to abandoned [sic] him. He was very
angry about that. The things that [Baker] had said led
me absolutely to believe that the bodyguard was present
at the time the beating took place. The man's angry

_____

[5]The reference by Baker to Ron and Baker eating sausages near
Baker's tent shortly before Ron assaulted him with a brick is
interesting, bearing in mind the testimony of witness Brown that a
short while before the incident when, according to Brown's testimony,
petitioner hit Baker with a chunk of asphalt, Baker had barbequed
sausage. Trial Tr. at 83-85.

20

[sic] was at the bodyguard's failure to protect him.
The bodyguard was driving a white Toyota Cressida about
a 1982/83 model car. Then me and [Baker] started
talking about the ongoing violence that kept occurring
to him . . . .

Id. at 35.

### 3. Other Things the Jury Was Not Told About "Ron".

The "Ron" mentioned during the trial and by Baker to both

Oakley and Thomas as being a person who assaulted him is

mentioned in other investigatory material that was in possession

of the prosecution team, and presumably in possession of

petitioner's trial counsel, in advance of petitioner's trial.   On

February 17, 2003, detective Waters learned from Tony Davis, an

employee of Daily Bread Ministries, which operates the slab

church, the following:

Davis stated that he knows of a black male named Ron
who comes by most mornings for coffee and donuts.
According to Davis, Ron has an anger problem.  He
described Ron as 43 years old, 6' 4" 200 pounds, brown
skinned with a mustache.  Davis said that [Baker] was
not well liked by most of the people who hung out
around there.  [Baker] had hit a woman recently and
Davis had told the victim he should leave for a while,
because "some of the guys were gonna jump on him for
it."

Id. at 53.

Ron, whose full name is Ronald James Watkins, gave a

statement to investigators on February 18, 2003.  He referred to

21

petitioner as "Albert," Qualls as "Leo," and Baker as "Tent Man."
The pertinent part of his statement was as follows:

> I have been sleeping in a vacant house right next to
> the "Church on the Slab". It is at I-35 and Rosedale.
> I know most of the people that hang around there. I
> have known a guy named Albert for at least 10 years.
> He has been gone for about 3-4 months, but he showed up
> again last week. I had stopped at the Slab for coffee
> and doughnuts like I do in the morning and Leo told me
> that Albert was back. I went around to talk to Albert
> and we talked about a lot of things. The conversation
> led to Albert telling me about him getting in to a
> fight with a guy we call the "Tent man". The fight
> started because the Tent Man was telling racial jokes.
> Albert told him to stop using the word nigger, but the
> Tent Man kept saying it over and over again. They got
> into a fight. Albert said they got into a fight he
> whipped him. Albert said he was on top of him hitting
> him and a guy in a white car told him not to hit him
> anymore. Albert said that Leo Quails and the guy in
> the white guy were there when this happened. After the
> fight, Albert went over to the big tent and went to
> sleep with a stick beside him. The Tent Man came up on
> Albert, got Albert's stick and started beating him with
> it. Albert said he got hit in the back of his head and
> I seen some blood on the beige pants Albert was
> wearing. Albert said the Tent Man used the stick and
> put it across his throat and was choking him out.
> Albert acted like he was passing out so the guy would
> stop. I know it was Thursday morning that Albert was
> telling me this because the Slab is not opened on
> Friday. I don't know the guy's name in the white car,
> but I am pretty sure he got arrested and I think he is
> still in jail.

Id. at 26 (errors in original).

Fornier, in the statement he gave to the investigating

officers on February 19, 2003, said that the morning of February

14 Baker pointed out Ron as the person who had assaulted him:

About 15 minutes goes by and a black male wearing a
blue jacket, 6'3" came walking from behind Daily
Ministries. Immediately the old man becomes extremely
agitated all over again, grabs his iron and tell me he
is going to go get payback. He told me "that is the
man right there that beat me last night", pointing at
the man in the blue jacket as he walked by. I
convinced the old man not to do anything, just let it
go. Tbe man in blue walked eastbound on Rosedale under
the freeway. The old man sitys down extremely angry
again that he didn't do anything and we started talking
again to settle him down.

Id. at 35 (errors in original).

In the arrest warrant affidavit, detective Waters had the

following to say about Ron:

Your affiant interviewed Watkins, who supplied stated
[sic] that he had talked to a black male that he knows
as Albert and that Albert had told him about beating
the "tent man" with a brick. "Tent man" is how most of
the homeless people in the area referred to Cullen
Baker. Watkins vehemently denied having had anything
to do with assaulting Baker though he did admit that he
did not like the man and that they had exchanged words
before. Watkins further advised that Leo Qualls, who
is a homeless black male who hangs around the area and
another man named "Brown" were with the victim on
Thursday night. Watkins stated that "Brown" acted as a
body guard for the victim and drives a small white

23

vehicle with front-end damage. Watkins was scheduled
for a polygraph examination for 0800 hours on 2-18-03.

Id. at 16. As Waters had arranged, Ron underwent a polygraph

examination on February 19, 2003, that resulted in a finding of

"Inconclusive" and the opinion of the polygraph examiner that Ron

was "Untruthful" when answering the following questions:

Did you hit Cullen Baker the tent man at any time last
Friday?

Answer:  NO

Did you personally see anyone hit Cullen Baker the tent
man last Friday?

Answer:  NO

Did you strike Cullen Baker the tent man last Friday
with any weapon?

Answer:  NO

Id. at 44-45.

   4.   The Evidence Withheld from the Jury Could Have
        Made a Significant Difference in the Outcome of
        Petitioner's Trial.

    The jury was led to believe that petitioner was the only

person involved in an altercation with Baker. If there had been

a full disclosure to the jury, the jury would have known that

after he had been assaulted Baker said that four people were

involved in the assault, that Ron was one of, if not the main,

assailant, that the assault occurred as he was asleep, that the

                                24

assailants were retaliating against him for an incident that
occurred a few days earlier involving a woman, and that all of
the assailants left on foot after they assaulted him.  There is a
distinct possibility, if not a probability, that the jury would
not have convicted petitioner of murder if there had been a full
disclosure to the jury of the available evidence.

The court is puzzled why the prosecutor did not make a
complete disclosure to the jury so that the jury could reach its
verdict with full knowledge of the available evidence, including
the evidence tending to favor petitioner.[6]  Even more puzzling is
why petitioner's trial counsel Davis objected to the admission of
evidence of what Baker said to Oakley and Thomas when he was at
the Thomas residence the morning of February 14 and what Baker
said to Fornier later that morning.  There is nothing in the
record before the court that would provide an explanation other
than inadequacy of petitioner's trial counsel as to why the
statements Baker made, while excited, at the Thomas residence the
morning of February 14 were not at least tendered into evidence
by Davis.  The fact that Baker mentioned the name "Albert" to

---

[6]Giving the prosecutor the benefit of the doubt, she may have
intended to make a complete disclosure to the jury, but was frustrated
in that attempt by the hearsay objections made by Davis.

25

Oakley as one of the assailants would not seem to provide justification for keeping from the jury the other things Baker said, which would have tended to raise a genuine doubt in the minds of the jurors as to whether someone else assaulted Baker after the altercation occurred between petitioner and Baker.

The court recognizes that there might well be hearsay problems with some of the exculpatory evidence that was not presented to the jury; but, there appear to be exceptions that could be applicable, such as the excited-utterance exception found at Rule 803(2) of the Texas Rules of Evidence.

Somewhat related to the subject under discussion is the apparent failure of petitioner's trial counsel to engage in the basic pretrial activity by interviewing important witnesses in advance of trial, certainly before the witnesses take the witness stand.[7] The trial record reflects that Davis had not visited at all with important witnesses Oakley, Brown, and Qualls before they took the stand (other than to waive at Qualls in passing the

---

[7]The court recognizes that the state trial judge granted a motion filed by Davis for appointment of an investigator, and that the investigator might well have visited with important witnesses. However, nothing presented by Davis in the affidavit she filed for the state in the state habeas proceeding makes such a disclosure. Moreover, the fact that an investigator might have interviewed witnesses does not eliminate the need for the trial attorney herself to visit with important witnesses before they take the witness stand.

day before he testified), and that her only visit with witness

Fornier was for a moment in the hall just before he took the

stand.  The overall impression presented by the record is that

Davis did not properly prepare for trial, had no organized plan

of defense, and did as little as she thought she could get by

with in the defense of petitioner.  Much of Davis's cross-

examination of the witnesses was pointless, many of her

objections to testimony were unreasoned, and some of her

questioning tended to develop testimony against petitioner

instead of in his favor.  The court finds puzzling that Davis did

not present anything other than a five-sentence statement to the

judge for consideration at the punishment phase of the trial.

B.    Trial Counsel's Failure to Request a Lesser-Included
      Offense Instruction Appears to be Inexcusable.

The court's charge to the jury at the guilt or innocence

phase of petitioner's trial did not contain a lesser-included

offense instruction of any kind.[8]  The record reflects that Davis

---

[8]The court is denying the ground of petitioner's motion that
independently complains of the state court judge's failure to include
in his charge to the jury an instruction that would authorize the jury
to find defendant guilty of the lesser-included offense of aggravated
assault.  That denial was based on the authority that the failure to
give an instruction on a lesser-included offense does not raise a
federal constitutional issue.  See Creel v. Johnson, 162 F.3d 385, 390
(5th Cir. 1998); Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1998);
Alexander v. McCotter, 775 F.2d 595, 601 (5th Cir. 1985).  However,
(continued...)

27

made no request for such an instruction. The court is inclined
to believe that the trial record would have justified, and
required upon request, giving the jury a lesser-included offense
instruction on aggravated assault, or manslaughter, if not both.
There is a possibility, if not a probability, that the jury would
have found petitioner guilty of a lesser-included offense if an
appropriate instruction had been given. Certainly if the
evidence that appears should have been, but was not, presented to
the jury had been before the jury, the jury probably would have
concluded that, if petitioner committed any offense, it was
something less than murder.

Nothing in the record provides an explanation other than the
failure of petitioner's trial counsel to do her job properly as
to why a lesser-included offense instruction was not requested.
There is nothing in the record to suggest that such an
instruction would not have been given if Davis had requested it.

_____

[8](...continued)
failure of trial counsel to request such a jury instruction can be
basis for a claim of ineffective assistance of counsel.

C.  Trial Counsel's Failure to Put into Evidence the Rating
    Decision Records of the Department of Veterans Affairs
    Pertaining to Petitioner's Physical Condition in Mid-
    2002.

The Rating Decision records of the Department of Veterans
Affairs pertaining to petitioner are in the state court habeas
record at pages 111-121. Petitioner's trial counsel was aware of
the importance of establishing petitioner's physical limitations.
She touched on the subject more than once through her questioning
of petitioner and again during the punishment phase of the trial.
However, petitioner's testimony on that subject did not carry the
weight that would have been enjoyed by the official records
documenting his limitations, particularly bearing in mind that
petitioner was branded a liar at trial by virtue of having
initially made a false statement to detective Waters that he did
not hit Baker.

The Rating Decision records establish that petitioner is a
Vietnam War veteran, who served in the marines in 1972 and 1973.
Based on his evaluation by the V.A. medical staff in June 2002,
he was determined, for practical purposes, to be totally
disabled. State Ct. Habeas R. at 111. He was diagnosed as
having the following conditions:

    1.   Coronary artery disease status post
aortocoronary bypass.

2. Atherosclerotic cardiovascular disease status post myocardial infarction.see heart c/p exam.

3. Polysubstance abuse.

4. Chronic pancreatitis with hx of recurrent flare-up.

5. Right elbow injury, status post surgical intervention with limited range of movement and residua.DJD -Posttraumatic.

6. Hypertension, essential.

7. Asymptomatic tachycardic arrhythmia.

8. Angina pectoris, stable.

Id. at 121.

The records establish a history of petitioner having frequent chest pains for which he must take nitroglycerin, that he is unable to walk more than one-half block without stopping, because of pain in his legs, and of having had triple bypass surgery in June 2000 and exploratory abdominal surgery due to a gunshot wound, the bullet from which is still in petitioner's abdominal cavity. Id. at 116. He has a history of having had a cerebrovascular accident in 2000, which left him with a left-sided weakness. Id.

While not conclusive on the subject, these medical records would have provided credible evidence from which petitioner's trial counsel could reasonably argue to the jury that

30

petitioner's physical condition was such that he would not have engaged in the kind of assault on Baker that Brown and Qualls described.[9]

Presumably the records would have been admitted into evidence if properly authenticated. The court finds nothing in the material before the court that would explain why petitioner's trial counsel did not tender these records for consideration by the jury and state trial judge other than the failure of counsel to do her job properly.[10]

D. Other Complaints of Petitioner About the Conduct of His Trial Counsel.

The court has discussed above the areas of particular concern the court has relative to the trial representation

---

[9]While petitioner's trial counsel in her five-sentence plea for leniency at the penalty phase of the trial represented to the judge that petitioner "is on disability from his open-heart surgery" and requested that the judge "consider a lower sentence in the light of his health problems," Trial Tr. at 203, the record does not indicate that Davis provided the state judge any medical support for her plea.

[10]The court is not exploring in this memorandum opinion the claim of petitioner that if his trial counsel had been doing her job properly she would have arranged for his chest to be x-rayed for the purpose of verifying his contention that Baker hit him so hard with a stick that it fractured one or more of his ribs. In support of this claim, petitioner calls the court's attention to a report of an x-ray made of his chest in January 2004, showing that he had healed rib fractures on the right. State Ct. Habeas R. at 174. This is a point counsel appointed by the court undoubtedly will want to explore, including an exploration of whether proof would have been available at trial of an x-ray taken of petitioner's chest prior to February 2003 that showed absence of rib fractures at that time.

31

provided to petitioner. Petitioner has other complaints about his trial representation scattered through his habeas papers. The court does not mean by failure specifically to discuss other complaints to imply that the court has concluded that they are without merit. Presumably counsel the court is appointing to represent petitioner in the pursuit of petitioner's ineffective assistance of counsel claim will develop and pursue the other complaints to the extent thought appropriate.

III.

## The Court has Concluded that Counsel Should be Appointed for Petitioner and a Hearing Should be Held

By a memorandum signed by the state trial judge on January 3, 2006, in petitioner's state court habeas proceeding, the judge determined that the merits of petitioner's ineffective assistance of trial counsel claim would be heard, but "by way of an affidavit only from Applicant's trial counsel, Hon. Jill L. Davis." State Ct. Habeas R. at 150. Davis filed an affidavit in the state court on February 2, 2006. Id. at 151-53. She said that the prosecutor gave her all discovery well before trial, and that she reviewed all statements, reports, et cetera, numerous times.

32

Davis's response to the complaint that she did not request a lesser-included offense instruction was that she believed that such a request "would have been frivolous." Id. at 152. No further explanation was given. She said that she "presented any and all exculpatory evidence available to [her]," id. at 153, but she provided no explanation as to why she did not tender as evidence the statements made by Baker that would have been evidence that the events related to the assault on him were not as the prosecution portrayed them to be by its evidence. As to why she did not offer medical records into evidence, she said in the affidavit, without explanation, "I could not present a medical records 'alibi' with clear conscience based on my duty as a lawyer." Id. at 153.

In sum, Davis's affidavit is virtually meaningless. Any hearing based on that affidavit would be just as meaningless. The findings made and conclusions reached in the trial court habeas proceeding based on the affidavit are equally meaningless.

Therefore, the court is ordering an evidentiary hearing on petitioner's ineffective assistance of counsel claim, and is appointing an attorney to represent him as to that claim.

IV.

## Conclusion

The thoughts and conclusions of the court has expressed in
this memorandum opinion are tentative, based on the record now
before the court. As the court explained to petitioner during a
recent telephone conference the court conducted with petitioner
and counsel for respondent on the line, petitioner is not to
assume from any of the court's tentative thoughts and conclusions
that the court has decided that petitioner is entitled to relief.
Material submitted by respondent in response to this memorandum
opinion, and evidence adduced at the hearing the court is
ordering, could well cause the court to make findings, and reach
conclusions, at variance with the tentative ones expressed in
this memorandum opinion. For example, the court might find that
petitioner's trial counsel, Davis, had valid reasons for
conducting herself as she did in preparation for trial and at the
trial. The court will give appropriate consideration to whatever
explanations she might provide.

## Order

Consistent with the foregoing,

The court ORDERS that the recommendation of denial made by
Judge Bleil on April 24, 2008, be, and is hereby, accepted as to
the grounds of petitioner's petition that are referred to as
grounds (1), (2), (3), and (4) on page 3 of this memorandum
opinion and order, and that relief based on those grounds be, and
are hereby, denied.

The court further ORDERS that a hearing be held commencing
at 10:00 a.m. on July 15, 2008, on the ineffective assistance of
counsel ground of petitioner's petition for writ of habeas
corpus, at which time and date petitioner, counsel for
petitioner, counsel for respondent, and all witnesses for either
party be present in the Fourth Floor Courtroom, United States
Courthouse, Fort Worth, Texas.[11]

The court further ORDERS that respondent take whatever steps
are appropriate to cause petitioner to be in Fort Worth for
attendance at such hearing, and to cooperate with counsel for

_____

[11]The court anticipates administering the oath to all witnesses at
the same time, before the evidence commences.  Therefore, if a party
wishes to use a person as a witness, that person must be present at
the commencement of the hearing.

petitioner to arrange for petitioner's availability in Fort Worth in advance of the hearing to consult, as appropriate, with his counsel.

The court further ORDERS that Danny D. Burns ("Burns"), a member of the bar of this court, be, and is hereby, appointed to represent petitioner in the presentation of his ineffective assistance of counsel ground.

The court further ORDERS that the clerk of court promptly provide to Burns a copy of the entire record of this action, exclusive of the state court record provided to the court by respondent.[12]

The court further ORDERS that respondent, through counsel, promptly provide to Burns exact copies of the state court records

---

[12]The material to be provided by the clerk to Burns shall include the document filed by respondent under seal on May 27, 2008, titled "Respondent Quarterman's Advisory to the Court" and all items that accompanied that document. The court informed counsel for respondent during a recent telephone conference that the court intended to unseal that document and the items accompanying it. So far the court has not ordered the unsealing, and plans to study the matter further before making a decision on that subject. However, there is a need for Burns, as the court-appointed attorney for petitioner, to have copies of all of those items, whether they remain under seal or not.

The thought occurs to the court that if there are things in those documents that should not become a part of the public record of this proceeding, respondent should file with the court a redacted copy of the same documents, redacting out any parts that respondent does not wish to have in the public record. If respondent does that, the court can better evaluate whether unsealing of the unredacted documents would be appropriate.

36

(trial court, appellate courts, and habeas proceeding) respondent previously provided to the court.

The court further ORDERS that if petitioner, through counsel, wishes to amend the petition to eliminate grounds that have been denied by the court and to focus more precisely on the ineffective assistance of counsel ground such amendment be filed by 2:00 p.m. on June 23, 2008.

The court further ORDERS that if respondent wishes to respond to the concerns expressed by the court in the foregoing memorandum opinion such response be filed by 2:00 p.m. on June 16, 2008, and that if respondent wishes to answer any amended petition filed by petitioner pursuant to the authority of this order, such answer be filed by 2:00 p.m. on July 2, 2008.

The court further ORDERS that:

(1) By 2:00 p.m. on July 11, 2008, petitioner and respondent each shall file a witness list and an exhibit list.

(2) The parties shall not file exhibits prior to the hearing, but shall have the originals and one copy thereof available immediately prior to the hearing. Each exhibit that will be offered at the hearing shall

37

bear the case number of this action in addition to the
exhibit number and identity of offering party.

(3)  The witness list shall be accompanied, when it is
     filed, by a statement as to each witness of each
     subject matter upon which the witness will be asked to
     testify.  The witness list shall include a column
     bearing the heading "Sworn" and another bearing the
     heading "Testified" to help the court keep track of the
     witnesses at the hearing.

(4)  The exhibit list shall be accompanied, when it is
     filed, by a statement signed by counsel for the
     opposing party stating, as to each exhibit shown on the
     list, either that the opposing party agrees to the
     admissibility of the exhibit or the nature and legal
     basis of any objection that will be made to the
     admissibility of the exhibit.  All parties are required
     to cooperate in causing such statements to be prepared
     in a timely manner for filing with the exhibit lists.
     The party proposing to offer an exhibit shall be
     responsible for coordinating activities related to
     preparation of such a statement as to the exhibit he
     proposes to offer.  No exhibit will be offered at the

hearing unless such a statement has been timely filed
as to the exhibit.  The exhibit list shall include a
column bearing the heading "Offered" and another
bearing the heading "Admitted."

(5)  No party is permitted to adopt as, or in, the party's
witness list or exhibit list all or any part of the
witness list or exhibit list of the other party.

SIGNED June 2, 2008.

JOHN McBRYDE
United States District Judge